## McLEOD v. FOURTH NATIONAL BANK OF ST. LOUIS.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MISSOURI.

Argued April 27, 1887. — Decided May 27, 1887.

The transcript of the evidence at the trial of this case, which is contained in the bill of exceptions, does not connect the defendant in error with the frauds which gave rise to this suit.

THIS was an action at law. The case is stated in the opinion of the court.

*Mr. Frederick N. Judson* for plaintiffs in error. *Mr. John H. Overall* was with him on the brief.

*Mr. G. A. Finkelnburg* for defendant in error. *Mr. George A. Madill* was with him on the brief.

MR. JUSTICE MILLER delivered the opinion of the court.

This is a writ of error to the Circuit Court of the United States for the Eastern District of Missouri.

The plaintiffs in error were the plaintiffs in the original action, the gravamen of which was that the defendant, the Fourth National Bank of St. Louis, conspired with the firm of Norvell, Camfield & Co., who were dealers in cotton in that city, to obtain from the plaintiffs, McLeod & Reid, residing in the city of Glasgow, Scotland, the acceptance of a draft drawn by Norvell, Camfield & Co. upon said plaintiffs for six thousand pounds sterling, and that this draft was accompanied by a fraudulent bill of lading, on the strength of which plaintiffs accepted and were compelled to pay it. The bill of lading was for a certain number of bales of cotton, which were falsely represented to contain 276,850 pounds, whereas the aggregate weight of these bales when re-weighed at the place of delivery was only 192,385 pounds.

That this bill of lading was false, that it was gotten up by fraud, and that this fraud deceived the plaintiffs, there is no question. Nor is there any doubt that the fraud was perpetrated by Norvell, Camfield & Co. ; The case was tried before a jury on the general issue, by which the bank denied all the allegations of fraud, and in general everything charged in the declaration. The court refused several requests to charge made by the plaintiffs with regard to the connection of the bank with this fraud, and in the end peremptorily instructed the jury that there was no evidence to support such an allegation of fraud on the part of the defendant, and that they must find for the bank.

This bill of exceptions, like so many others that we find in the records that have been sent up to us recently, is simply a stenographic report of all that took place at the trial, and we are expected to consider the whole of this evidence and pick out such portions of it as may be pertinent to the issue, as if addressed to us originally, and to ascertain whether there was any evidence which should have been left to the jury on the question of the participation of the defendant in the fraud.

The main facts in the case are substantially as follows :

Norvell, Camfield & Co. were dealers in cotton in St. Louis. They bought this commodity throughout the cotton region, brought it to that city, and then sold it in the markets of the Eastern States and of Europe. To enable them to carry on their extensive business they required large advances from the capitalists of St. Louis, and these were obtained mainly from its banks. The defendant bank in this case had so advanced them about sixty-four thousand dollars, and in every instance, as such advances were made, the firm deposited with the bank what were known as " cotton notes." These were instruments made by a warehouse company, whose business it was to receive and take care of cotton until it was sold, or its delivery demanded by the person who originally deposited it in the warehouse, or by some holder of the cotton notes. Each note represented a bale of cotton, and the following is the form of these instruments in general use in that business :

" [No. of bale.]    Received in store of—— ——, one bale of

cotton, in apparent good order, of the above number and following marks, [marks, if any,] deliverable to bearer upon return of this receipt, and payment of warehouse charges, risk of fire excepted.

(Signed) —— ——, Secretary."

The cotton of Norvell, Camfield & Co., which is the subject of this controversy, was stored in the warehouse of the St. Louis Cotton Compress Company, and the notes therefor were in the hands of the bank, when Camfield, one of that firm, without obtaining the notes from the bank, or any orders from it, had a very large amount of this cotton transferred to a cotton "pickery," as it was called. There the bales were opened, the cotton picked, reassorted, and repacked, and the tags with the numbers on them, which represented the cotton as it was originally delivered to the warehouse company, reattached to these readjusted bales. In doing this, the quantity of cotton in each bale was so much reduced that the difference was made, which we have already stated, between the amount which was called for by the bill of lading and the amount which was received in Glasgow.

By what means Camfield obtained the cotton from the warehouse without the production of the notes is not explained, nor is it very material in this case, as there is no evidence to show that the bank had anything to do with that transaction, but was informed of it after it was over and the cotton returned to the warehouse. Upon being so informed it took some steps to ascertain the amount of the loss it might incur by this multiplication of the bales out of this same cotton, had some fifteen or sixteen bales re-weighed, and called upon Camfield to put up further margins, which he did.

During this time, or shortly afterwards, and while the matter remained in this condition, Mr. Norvell, who was in Europe, negotiated the sale of this cotton to the plaintiffs, and Mr. Camfield, his partner in St. Louis, forwarded it to Glasgow by way of New York. In doing this, he forwarded it by railroad from St. Louis to the Atlantic coast, and took

from the transportation company at St. Louis a bill of lading, describing the bales by their numbers and weights, which amounted to the aggregate number of pounds already stated. In order to obtain these bales for shipment from the warehouse company, Camfield had to produce the notes which were in the possession of the bank. Of course he could only do this by the bank intrusting him with the notes for the short time necessary to make the shipment and procure the bill of lading, when, having delivered up the notes to the warehouse company in order to get possession of the cotton for shipment, he was to return the bill of lading, which represented the cotton, to the bank.

In all cases of shipments of this character from St. Louis to the Eastern States or Europe, the transportation company, on giving its bill of lading, requires a re-weighing of the cotton upon delivery to it, and, upon that being done, the weights are marked upon the bales or certified by the weigher in a schedule or statement. There are persons appointed for this special purpose of re-weighing cotton for transshipment. It is upon the strength of this re-weighing that the transportation company makes out its bill of lading.

What was done in the present case was, that Camfield induced the clerk, or other officer who made out this bill of lading, to accept his own statement of the weight of the bales and to give his bill of lading accordingly, without ever having the cotton re-weighed or having any certificate of the re-weigher thereto. The number of bales was all right; but in this way, Camfield obtained from the transportation company a false bill of lading. Upon this Camfield, in the name of his firm, Norvell, Camfield & Co., drew his draft upon the plaintiffs at Glasgow, at sixty days, for a sum corresponding to the amount in the bill of lading, and to the contract price which Norvell had made with them in Europe. This draft the defendant bank declined to buy, and Norvell, who had returned to America, negotiated and sold it to Knoblauch & Lichtenstein, bankers in the city of New York, and the money, or so much of it as was necessary to pay its debt, was turned over to the defendant.

Of course the plaintiffs, who had accepted the draft on its presentation with the bill of lading, were bound to pay it at its maturity; although in the meantime they had discovered the discrepancy between the amount of the cotton actually shipped and that described in the bill of lading.

The defendant bank never indorsed this bill of lading; it was never made payable to it. It never did anything to give it currency or to make itself responsible for its accuracy, and it was no party to the bill of exchange. The whole case of the plaintiffs is, that, having received the proceeds of the sale of this bill of lading from Knoblauch & Lichtenstein in discharge of the debt of Norvell, Camfield & Co. to the bank, it so acted in regard to the matter as to be a participant in the fraud which was practised by that firm. The whole case then turns upon the truth of this allegation.

It is attempted to be supported principally upon the ground that Mr. Biebinger, who was the cashier of the bank, was aware of the change made in the quantity of cotton in the "pickery," where it was re-baled. But it does not appear that he, or any other officer of the bank, had any reason to suppose that the number of bales re-packed at that establishment was very considerable. They had fifteen or sixteen of them weighed, and called upon Camfield to make good the deficiency, so far as they knew of it, which he did. This was all that concerned them; they were only acting for themselves; there was no obligation between them and anybody else at that time to disclose this matter, as there was nobody then interested in the property but the bank and the firm. They might very well have supposed that whenever this cotton was sold by the firm and was to be delivered, that the rule for re-weighing would be complied with, and that the purchaser of the cotton, or of the bill of lading, or of the bill of exchange drawn on it, would have seen to his own security in that matter, and would have relied, as he had a right to do, upon the sufficiency of the process of re-weighing for that protection.

It is very clear from the evidence, and it is undisputed, that this re-weighing is the uniform and regular custom, and that it constitutes the evidence of the weight of the bales in the

final sale by the cotton dealer of St. Louis to the purchaser in the Eastern or European market. Is there any evidence to show that the bank was guilty of any fraud, or of any negligence which amounted to a fraud, or had any design to cheat anybody in this matter? When Camfield notified them that the cotton had been sold, and that he wanted to ship it, the use of the cotton notes, which they held as security for the amounts due to them, was necessarily to be intrusted to one of the owners, or to one of their agents, for the purpose of getting the cotton out of the warehouse. It could not remain there and at the same time go East; neither could it be obtained from the warehouse for shipment without the use and delivery of the notes. For the short time necessary to ship this cotton and obtain the bill of lading it was a matter of necessity, as well as a custom, unless the bank would undertake the business for itself, to intrust these notes to the shipper in order that he might do it.

In this we see no injury to the plaintiffs. All the risk involved in it was borne by the defendant, who trusted Camfield with the notes which represented the property until he brought back the evidence that the cotton had been shipped. When this was done, and Camfield had drawn his draft in the name of Norvell, Camfield & Co. upon the plaintiffs for the amount of the cotton, according to the terms of sale, it appears that he wanted to sell the draft to the bank, but it refused to buy it, and it was finally negotiated to Knoblauch & Lichtenstein in New York, and the money placed to the credit of the defendant bank there.

In order to sustain the argument arising out of this transaction, that the defendant bank was itself cognizant of this fraud, and that it was practised for its benefit, it is argued by plaintiffs' counsel that the bank was the owner of the cotton. If this proposition is in any way pertinent to the inquiry, it is not true. The bank never had anything more than a pledge of the cotton as a security for the payment of its debt. The real ownership of the property always remained in Norvell, Camfield & Co. They could sell it at any time; and, after the payment of the debt due to the bank, receive the remainder;

if it had been sold for less than the debt to the bank, the loss would have been theirs, and not the bank's, if they were solvent.

This firm did sell the cotton ; it was not sold by the bank ; they shipped it, and the bank did not even accept their bill of exchange drawn against the cotton in payment of their debt, but insisted on getting the money, and therefore the bill of exchange was sold in the city of New York.

The essential ownership of the cotton during all the time of this transaction was in Norvell, Camfield & Co., and any loss upon it was their loss, any profit upon it was their profit, and the bank only had this modified control of it by means of the cotton notes of the warehouse company, which, in effect, they relinquished when they delivered those notes to Camfield. Their actual control over the cotton, or over its proceeds, ceased with the delivery, and their acceptance of the proceeds of the draft at the hands of the New York bankers, who bought it, was a thing they had a right to do, both in honor and according to all sound rules of mercantile law.

Certain letters of introduction, given by the defendant bank to Mr. Norvell on a visit to Europe, made by him, and certain very guarded answers to inquiries made by a Dutch house in Europe as to his character and responsibility, are introduced to show that the bank was using this means of enabling Norvell to raise the money for them by selling the cotton. We do not think these letters have any tendency to prove any such thing. And without going into the large mass of testimony on this subject, having considered the main and turning points in the controversy, and the principal points upon which plaintiffs rely to establish the fraud upon the part of the bank, we are of opinion that the Circuit Court was right in telling the jury that there was no such evidence as justified them in finding a verdict for the plaintiffs.

*Judgment affirmed.*